**Susan and Dennis FORD, Plaintiffs, Appellants,**

v.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, Defendant, Appellee.**

**No. 02–2115.**

United States Court of Appeals, First Circuit.

April 8, 2003.

---

Gerald F. Petruccelli, James B. Haddow,
Petruccelli, Martin & Haddow, LLP, Ter-
rence D. Garmey, Sarah K. Hall and

Smith, Elliott, Smith & Garmey on brief for appellants.

Daniel R. Mawhinney, Elizabeth K. Peck and Thompson & Bowie, LLP on brief for appellee.

Before LYNCH, Circuit Judge,
BOWNES, Senior Circuit Judge, and
HOWARD, Circuit Judge.

BOWNES, Senior Circuit Judge.

Plaintiffs-appellants Susan and Dennis Ford ("the Fords") commenced a civil action seeking the full amount available under the underinsured motorist provision of the automobile policy issued to them by defendant-appellee Nationwide Mutual Fire Insurance Company ("Nationwide"). Susan Ford was seriously injured in a collision with a pickup truck driven by Kevin Lawrence ("Lawrence").[1] Lawrence's insurance company paid the full liability limit of his insurance policy, $15,000, leaving the Fords with claims against their own policy for $235,000 (the full amount of the Fords underinsured provision in their policy of $250,000 with Nationwide less the $15,000 paid by Lawrence's insurance company).

The action was filed in the superior court in Cumberland County, Maine, and removed by Nationwide to the United States District Court for the District of Maine. The jury returned a verdict that both drivers had been negligent, and that the negligence of Susan Ford had been greater than the negligence of Lawrence. Under Maine law this meant that Nationwide prevailed and the plaintiffs got nothing.

## I. The Facts

Susan Ford and her two sisters had a 6:00 a.m. flight from Las Vegas, Nevada to Phoenix, Arizona on March 6, 2000. The sisters decided to return their rental car on the way to the airport. To that end, they hired a taxi to drive with them to the rental car agency and then drive all three to the airport. The hired cab was driven by Alvin Reekie ("Reekie"). One of the sisters rode in the taxi; Susan Ford and the other sister rode in the rental car, which was driven by plaintiff Susan Ford. The two drivers became lost and could not find the rental agency and they pulled over to the side of Tropicana Boulevard, a six-lane highway. Reekie radioed his dispatcher to get directions to the rental car agency. After getting directions, he told Susan Ford and her sister to follow him.

Although there is some conflict between the parties about what happened next, there can be no question that the rental car was hit broadside by a pickup truck driven by Lawrence as Susan Ford attempted to turn across the highway. Before the collision, Lawrence attempted to avoid the car and slammed on his brakes, leaving skid marks of 43 feet. Susan Ford and her sister were seriously injured. Lawrence submitted to a blood-alcohol test two hours after the accident which revealed a blood-alcohol content of .115%, which exceeded the proscribed limit. He was subsequently charged with driving under the influence of alcohol. This was part of the evidence that was submitted to the jury.

## II. The Issues

We consider the issues in the order set forth in appellants' brief.

### A. The Admissibility of John Meserve's Expert Testimony

■ The plaintiffs contend that the district court improperly admitted the testimony of Nationwide's accident reconstruc-

---

1. Dennis Ford seeks consequential damages.

tion expert John Meserve ("Meserve"). Although the plaintiffs do not attack Meserve's reasoning or methodology, they emphatically argue that his testimony lacked a proper foundation. Plaintiffs contend that Meserve's testimony should have been excluded because it was impossible to determine: (1) the path and starting position of the rental car when it began to turn across Tropicana Boulevard; (2) the speed of the rental vehicle when first seen by Lawrence; (3) the speed of Lawrence's truck when he first saw the rental vehicle and the speed of Lawrence's truck between this point and the beginning of the skid marks; and (4) the position of Lawrence's truck at the moment Lawrence saw the taxi and rental car.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), provides guidance to a district court for determining the admissibility of expert testimony. *See Seahorse Marine Supplies v. P.R. Sun Oil Co.*, 295 F.3d 68, 80 (1st Cir.2002). Under *Daubert*, the district court functions as a gatekeeper and is assigned "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597,

113 S.Ct. 2786. While the district court has "considerable leeway" in determining reliability, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), credibility determinations and the weight of the testimony are the jury's responsibility.

Because the exact inquiry undertaken by the district court will vary from case to case, the district court need not follow any particular procedure in making its determination. *See United States v. Diaz*, 300 F.3d 66, 73 (1st Cir.2002). A district court's rulings regarding the reliability of an expert's opinion will only be reversed where there is a "meaningful error in judgment." *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 83 (1st Cir.1998). Accordingly, our review is for abuse of discretion. *See Seahorse*, 295 F.3d at 81.

### 1. The Path and Starting Position of the Rental Car

Contrary to the arguments raised by the plaintiffs, Meserve's determination of the starting position of the rental vehicle was not based upon a "wholly speculative assumption," but upon the physical evidence. Meserve examined the final resting position of the rental and Lawrence vehicles after the collision. Meserve then performed forty timing tests at the accident site to determine how long it would take a vehicle to travel from the curb to the point of impact. Based on the results of this testing, Meserve concluded that the rental vehicle must have moved in the path of an arc to have collided with the Lawrence vehicle. Consequently, Meserve used the path of the arc as his foundation to determine the starting position of the rental vehicle. Although the gist of plaintiffs' argument is that this evidence was "shaky," their challenges to Meserve's opinion were properly directed toward its

weight and not its admissibility. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. Plaintiffs vigorously cross examined Meserve on his conclusions. The district court did not abuse its discretion in admitting Meserve's testimony on this issue.

### 2. *The Speed of the Rental Vehicle When First Seen by Lawrence*

■ To determine the speed of the rental vehicle when Lawrence first saw it, Meserve first used the "crush data" analysis. This involves an analysis of the damage sustained by a vehicle as a result of being struck by another motor vehicle. The information about the damage to the rental car, its location and extent was furnished by plaintiffs to defendant. Meserve then conducted a further analysis called "conservation of momentum" to determine the speed at which both vehicles were traveling at the time of impact. The data used in the "conservation of momentum" analysis was: the angles of the two vehicles at impact; the deflection after impact; the rotation of the rental car; the distance both vehicles traveled after the collision; and the weight of each vehicle. This analysis resulted in a speed at impact which was in the upper range produced by the "crush data" analysis.

Based on his assumptions and computations, Meserve's expert opinion was that Lawrence would have had 1.5 seconds in which to see the rental car and react. Based on all of this data, Meserve concluded that the speed of the rental vehicle was approximately 10 miles an hour when Lawrence first saw it.

The Fords countered that the data they provided Meserve concluded that the rental vehicle was moving between 5–10 miles per hour. Meserve disagreed with this conclusion explaining that, in his opinion, there was no credible evidence to suggest that the rental car was traveling at a speed of less than 10 miles per hour. He further observed that a slower speed was inconsistent with his "conservation of momentum" analysis. Again, plaintiffs' argument goes to the weight of the evidence, not its admissibility. We are therefore satisfied that the district court did not abuse its discretion in allowing this opinion.

### 3. *The Speed of Lawrence's Truck Just Prior to the Collision*

■ Meserve estimated that Lawrence was traveling slightly faster than 45 miles per hour when he first saw the rental vehicle. This estimate was based upon the speed of Lawrence's truck when it began to skid and Lawrence's deposition testimony. At his deposition, Lawrence testified that his range of speed was between 45 to 55 miles per hour when he first saw the rental vehicle. Contrary to the Fords' suggestion, it was not improper for Meserve to rely in part on Lawrence's deposition testimony to reach his conclusion. *See e.g., Mitchell v. United States,* 141 F.3d 8, 16 (1st Cir.1998); *see also Clark v. Chrysler,* 310 F.3d 461, 471 (6th Cir.2002) (expert's opinion reliable where his testimony in the case was based, *inter alia,* on the depositions in the case); *Miles v. General Motors Corp.,* 262 F.3d 720, 724 (8th Cir.2001) (same). Meserve determined that Lawrence's speed was approximately 45 miles per hour between the time he perceived the Ford vehicle and before he began to skid. To reach this conclusion, Meserve relied on his knowledge of physics and compared the Fords' crush data with the length of the skid marks. We rule that the crush data and the length of the skid marks provided a reliable basis

for Meserve to form an opinion on Lawrence's speed. *See Quintana–Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 65 (1st Cir.2002) (accident reconstruction expert determined vehicle's speed before driver applied brakes based on the damage sustained by the car and the length of the skid marks).

### 4. *Lawrence's Location at the Moment He Saw the Taxi and Rental Car*

■ Meserve calculated Lawrence's location at the moment he saw the taxi and rental car using an equation called "back engineering." The speed Meserve used in this calculation was 45 miles per hour. The Fords attack Meserve's use of 45 miles an hour in this equation for the same reasons as stated above. As discussed, we are satisfied that the facts Meserve used to determine the speed were reliable. Accordingly, we are satisfied that the calculation in question here was based upon reliable data. Consequently, the district court did not abuse its discretion in allowing this testimony.

We close our discussion of the expert testimony by noting that plaintiffs had retained an accident reconstruction expert but, after the production of his report and on the eve of his scheduled deposition, plaintiffs withdrew their expert as a trial witness.

### B. *Excluded Portions of Alvin Reekie's Deposition Testimony*

#### 1. *The "Stipulation"*

■ Prior to trial, Nationwide agreed to concede damages *in toto* and pay the policy limits in the event that plaintiffs won on the issue of liability. The district court ruled, over the Fords' objection, that evidence relating to damages was unnecessary, and therefore need not be tried. The district court therefore excluded portions of Reekie's testimony that related to the

severity of Susan Ford's injuries. On appeal, the Fords maintain that the district court abused its discretion when it forced them to accept this, in the Fords' parlance, "stipulation" because they claimed the severity of the damages was probative on the issue of liability. We review the district court's evidentiary rulings for abuse of discretion. *See Walton v. Nalco Chem.*, 272 F.3d 13, 24 (1st Cir.2001).

Rule 16 of the Federal Rules of Civil Procedure provides that a trial court has the authority to narrow the issues for trial. *See Rogan v. Menino*, 175 F.3d 75, 80 (1st Cir.1999) ("To be sure, Rule 16 permits a court to dispose of . . . issues that do not warrant a full-dress trial"). Here, we are satisfied that the district court did not abuse its discretion. As the district court observed, "this was not a stipulation that required agreement; it was an outright concession." Accordingly, we agree that it was unnecessary to try the issue of damages. In any event, the jury did hear some evidence on the issue of damages that was in fact probative of liability: Ford's sister testified that she heard a "big crash" and that she was in hysterics; Lawrence testified that Susan Ford and her sister, Shirley Pole, who was in the rental car, were injured and that they were being attended to by emergency personnel; and Reekie testified that he thought the "girls could have been killed" and that he was "concerned about the girls" and "shook up." The district court did not abuse its discretion in limiting the damages issue.

#### 2. *Alvin Reekie's Testimony*

■ On appeal, the Fords maintain that the district court abused its discretion when it accepted Nationwide's concession and accordingly redacted portions of Reekie's testimony. The Fords argue that the exclusion of this testimony enabled Nationwide to impeach the credibility of Reekie

yet deprived them of an opportunity to fully rehabilitate him. The record shows that Reekie neglected to tell the police at the scene that Lawrence had been driving with his headlights off in the pre-dawn darkness. Reekie, however, testified at his deposition that the truck's headlights were off at the time of the accident. Reekie's deposition was taken 19 months after the accident. Nationwide undertook to impeach Reekie's credibility by suggesting that his failure to tell the police about the headlights at the time of the accident was really an indication that Lawrence had the headlights on just prior to the collision. The plaintiffs wanted to argue that the taxi driver failed to mention the pick-up truck's headlights because he was greatly distracted by the life-threatening injuries to Susan Ford and her sister. For this reason, plaintiffs argued that the extent of the injuries to Susan Ford and her sister should have been allowed in evidence. We quote the findings and rulings by the district court on this issue:

> In fact, before the trial was over the jury was well aware that this was a very serious accident. They heard Susan Ford's sister, Paula Koveleski, testify that she turned to look after she heard a "big crash," that she was in hysterics at the accident scene and that she thought her sisters were dying. David Moody, one of the police officers who investigated the accident, testified (by deposition) that there was extensive damage on the left side of Susan Ford's vehicle and that the accident involved injuries. Kevin Lawrence agreed that it was "a pretty serious accident," and testified that both of his air bags deployed in the collision and that he had to kick his door open before he could exit his truck. He also testified that Susan Ford and Shirley Pole were injured and that they "were being attended to by emergency personnel." In addition, the jury heard the

stipulation that, because of her injuries, Susan Ford was unable to recall the accident.

> Furthermore, the jury was not forced to rely on this evidence when assessing the cab driver's testimony. The cab driver, himself, testified about the severity of the accident and its effect on his mental state. They heard him testify (by deposition) that he thought the "girls could have been killed," that his passenger, Paula Koveleski, was "hysterical," and that he was upset and nervous. Several times he testified either that he did not recall certain details or that he did not report them to police because he was "more concerned about the girls," "shook up," or because of "the pressure [he] was under."

> Thus, the jury heard enough evidence for the plaintiffs' lawyer to pursue his theory of why the cab driver earlier failed to tell the police that Kevin Lawrence's headlights were off. The jury simply did not find it persuasive. (The plaintiffs' lawyer himself challenged the cab driver's credibility on another part of the evidence, namely, how he made the change of direction on Tropicana.)

(citations to the record omitted). As we have already explained, under the Federal Rules of Evidence the standard of review for the admission or exclusion of evidence is abuse of discretion. *See Miller v. Town of Hull, Mass.,* 878 F.2d 523, 529 (1st Cir.1989). We cannot find that the district court abused its discretion in excluding the full panoply of the injuries to Susan Ford and her sister.

Appellants make a rather involved argument that the abuse of discretion rule as to the trial judge's exclusion or omission of evidence under Federal Rule of Evidence 403 is overridden by common law practice. This contention is plainly incorrect; the

Federal Rules of Evidence govern. On appeal, the appellants also refer to Federal Rule of Evidence 613(b) which states in pertinent part:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Appellants did not raise this Rule at trial, so the argument is waived. *See Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 258 (1st Cir.1999). The Rule does not, in any event, help appellants.

What is at issue here is Reekie's failure to tell police during their investigation immediately after the accident that Lawrence's headlights were not on. Reekie testified *inter alia* by deposition taken 19 months after the accident as follows:

> So I turned in the side street, came back out. And I just made a U turn, but as I was going west on Tropicana this pickup truck come flying by. Swear to God he did not have his headlights on. And he was going at a high rate of speed. And the poor girls, they just made a U turn to follow me; smacked right into them.

On the cross examination part of Reekie's deposition the following question was asked of him relative to his failure to inform the police that the truck's lights were not on just prior to the accident: "Well, Mr. Reekie there is no mention in your statement, there is no mention of the accident report." Reekie interrupted and stated:

> *I was still trying to cut the girls out of the car.* I was really upset. Not as mad but I felt bad for the girls. *It took them an hour or so to cut them girls out of the car, for crying out loud.*

The underlined sentences were redacted by the district court before the deposition answer was read to the jury.

As the district court pointed out in its ruling on the admission of damages, there was ample evidence for the jury to realize that this was a serious accident and the plaintiff Susan Ford had been gravely injured. We rule that the redaction was not an abuse of discretion. Obviously the district court felt the jury should decide the issue of liability and not be swayed by the injuries suffered by Susan Ford and her sister.

The judgment below is *affirmed.*